**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

CHARLES G. BERNSTEIN,              *

         *Plaintiff,*              *

       v.                         *         Civil Case No. BEL-09-2915

STATE OF MARYLAND, *et al.,*       *

        *Defendants.*            *

*    *    *    *    *    *    *    *    *    *    *    *    *    *

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND IN
OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

This case presents the spectacle of a Maryland State-court judge, sworn to support the Maryland Constitution, asking a federal court to enjoin other State officials, who also have taken an oath to support the State Constitution, to disregard it instead.  The judge asks this Court not only to compel disregard of the Maryland Constitution, but to enter the requested injunction in disregard of controlling Supreme Court precedent upholding an analogous Missouri constitutional provision against an analogous challenge by a judge of that state.

The plaintiff, Charles Bernstein, a judge on the Circuit Court for Baltimore City, seeks this federal-court injunction to perpetuate his term of office beyond the time prescribed by Article IV, § 3 of the Maryland Constitution so that he can continue to earn a salary as an active judge and to earn additional credit towards his judicial pension.  Judge Bernstein claims entitlement to have his term of office extended by approximately 14 years, because he contends that the constitutional age restrictions – which prohibit active service by a judge

after he or she "shall have attained the age of seventy years"– violate his rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Judge Bernstein does not contend that a uniform 70-year-old age limit for judges in active service discriminates against him on the basis of age. As he acknowledges, any such claim is foreclosed by directly controlling Supreme Court precedent. Instead, Judge Bernstein contends that the constitutional age restriction is not in fact uniform, but instead creates two classes of judicial aspirants, both over the age of 70. This argument, too, is foreclosed by the same binding Supreme Court precedent, which upheld a materially indistinguishable Missouri constitutional provision. Judge Bernstein's complaint therefore fails to state a substantial federal claim.

According to Judge Bernstein, Article IV, § 3 creates a distinction between a disfavored class that comprises people who attain the age of 70 while serving as a judge and a favored class composed of people who were not serving as judges when they turned 70 but who then decide to seek appointment or election to a judgeship at a more advanced age. Under Judge Bernstein's theory, the first group must resign from active service at age 70, while the second group may be elected or appointed as judges even though they too "have attained the age of seventy years." This contention is based on a novel and untenable interpretation of Article IV, § 3. That interpretation finds no support in logic, grammar, history, or the common understanding of the age restriction since it was ratified by the citizens of Maryland more than three-quarters of a century ago.

2

This Court should reject Judge Bernstein's invitation to have a federal court impose on a Maryland constitutional provision the unprecedented and idiosyncratic interpretation he has proposed, which no Maryland court has ever endorsed.  The Court should not adopt a strained reading of the Maryland Constitution to create a false conflict with the federal Constitution, but should instead interpret the State constitutional provisions as a Maryland court would, based on the plain meaning of the text and its accepted understanding.  Doing so eliminates the asserted incompatibility with the United States Constitution and extinguishes Judge Bernstein's claims.[1]

Even if this Court were convinced that a Maryland court would construe the State Constitution in the manner that Judge Bernstein has urged, he has not stated a claim on which relief can be granted, because, under his own theory, he is a member of both the favored and disfavored classes that he contends are created by Maryland's constitutional age restrictions for judges.  That is, he is presently a sitting judge who will have to retire from active service on December 29, 2009, when he turns 70, but, under his construction of the Maryland Constitution, he could resign a day earlier and then be eligible to seek appointment or election as a judge.  Indeed, under Judge Bernstein's theory, all persons who meet the qualifications set forth in Article IV, § 1, who are over the age of 70 are treated equally,

---

[1] The claims against two of the defendants, the State of Maryland and the Maryland General Assembly, should also be dismissed on the independent grounds that both of these defendants enjoy sovereign immunity from suit in federal court under the Eleventh Amendment, and neither is a "person" subject to suit under 42 U.S.C. § 1983.

because all are eligible to become judges.  Judge Bernstein therefore has failed to establish a violation of his equal protection rights.

Judge Bernstein's equal protection claim fails for the even more fundamental reason that the distinction he posits between sitting judges and other judicial aspirants is supported by a rational basis, under the directly applicable reasoning of the Supreme Court's decision in *Gregory v. Ashcroft,* 501 U.S. 452 (1991), which rejected an equal protection challenge to a materially indistinguishable Missouri constitutional provision imposing a mandatory retirement age for judges.

If this Court determines that a Maryland court could conceivably accept Judge Bernstein's distorted reading of Article IV, § 3, the Court should stay its adjudication of Judge Bernstein's federal constitutional claims, and permit this predicate question of State law to be resolved in State court, in accordance with the *Pullman* abstention doctrine.  The Court may also wish to consider using the procedure of certifying to the Maryland Court of Appeals the underlying State-law question concerning the proper interpretation of Article IV, § 3, because in a case like this one, where the adjudication is not likely to require the resolution of factual disputes, that procedure tends to reduce delay and expense, while increasing the assurance of obtaining an authoritative decision on the State-law question. Neither abstention nor certification is necessary, however, if this Court determines that Maryland courts would not adopt the interpretation of the Maryland Constitution urged by Judge Bernstein or if the Court determines that, even under that interpretation, he has failed

4

to establish that the State Constitution violates his equal protection rights.  For the reasons discussed below, both of these determinations are correct, and the complaint should therefore be dismissed in its entirety.

Judge Bernstein has also sought preliminary injunctive relief.  His request should be denied.  Judge Bernstein is required to demonstrate that (1) he is likely to succeed on the merits of his claims, (2) that he will experience irreparable harm if the injunction is denied, (3) that the balance of equities favors granting the injunction, and (4) that the requested injunction would be in the public interest.  Each of these factors must be satisfied, and Judge Bernstein bears the burden of persuasion on each.  He cannot satisfy even one of these factors, and the preliminary injunction should therefore be denied.

## STATEMENT OF FACTS

### A.   MARYLAND'S CONSTITUTIONAL PROVISIONS IMPOSING AGE RESTRICTIONS ON ELIGIBILITY FOR ACTIVE SERVICE AS A JUDGE

The Maryland Constitution has imposed an age restriction on service as a State judge since 1851.  From 1851 to 1867, the Constitution did not permit a judge to serve beyond the age of 70.  *See* Md. Const. art. IV, § 3 (1851) (elected circuit court judge holds office for "term of fifteen years. . . or until he shall have attained the age of seventy years, whichever may first happen, and be reeligible thereto until he shall have attained the age of seventy years, and not after").  The 1867 Constitution continued a modified age-70 restriction that permitted a sitting judge to remain in active service after age 70 if, in the preceding

legislative session, the General Assembly passed a resolution allowing the continued service.

*See* Md. Const. art. IV, § 3 (1867).   In 1932, however, Maryland voters ratified an

amendment to Article IV, § 3 that removed the provision allowing legislative authorization

of judicial service beyond the age of 70, thus reinstating the flat prohibition on active service

by a judge who "shall have attained the age of seventy." 1931 Laws of Md., ch. 479 (ratified

Nov. 8, 1932).  In 1994, voters rejected a proposed amendment to Article IV, § 3 that would

have changed the age limitation from 70 to 75; the amendment would also have required a

judge serving beyond the age of 70 to be certified by a majority of the judges of the Court

of Appeals as "physically, mentally, and temperamentally qualified to continue to perform

the duties of the office." 1994 Laws of Md., ch. 104 (rejected Nov. 8, 1994).  Thus, the age

restriction that Judge Bernstein seeks to invalidate is an enduring feature of Maryland's

constitutional design for its judiciary.

The pertinent language of Article IV, § 3 that Judge Bernstein contends violates his

rights to equal protection states:

> Each of the [circuit court] Judges shall hold his office for the term of fifteen
> years from the time of his election, and until his successor is elected and
> qualified, or until he *shall have attained the age of seventy years, whichever
> may first happen,* and be reeligible thereto until he *shall have attained the age
> of seventy years, and not after.*

(Emphasis added.)  A related provision imposes the same age restriction on appellate judges.

*See* Md. Const. art. IV, § 5A(f).   Article IV, § 3A authorizes an exception to the age

restriction, allowing "the Chief Judge of the Court of Appeals, upon approval of a majority

of the court," to assign a former judge "to sit temporarily in any court of this State," notwithstanding the provisions that prohibit active service by judges who have attained the age of 70.  Finally, Article IV, § 5 directs that the Governor may not appoint a judge "who will become disqualified by reason of age and thereby unable to continue to hold office until the prescribed time when his successor would have been elected," *i.e.* the first biennial election that is more than one year after the occurrence of the vacancy, *see Hillman v. Boone,* 190 Md. 606, 613 (1948)).

## B.    JUDGE BERNSTEIN'S TERM OF OFFICE AND HIS CLAIMS FOR EXTENDING IT

Judge Bernstein was appointed to the Circuit Court for Baltimore City by Governor Robert L. Ehrlich, Jr. on October 10, 2006.  (Exhibit A to Plaintiff's Mot. for Preliminary Injunction.)  In accordance with Article IV, § 3, Judge Bernstein successfully ran for election to retain his seat in November 2008.  (Exhibit B to Plaintiff's Motion.)  Following his appointment and again following his election, Judge Bernstein swore the oath of office prescribed by Article I, § 9, in which he pledged to "bear true allegiance to the State of Maryland, and support the Constitution and Laws thereof."  (The oaths, which are required to be filed and recorded in the clerk's office of the Circuit Court for Baltimore City, are attached as Exhibit 1.)

Judge Bernstein's term will end on December 29, 2009, when he will "have attained the age of seventy years."  (Exhibit A to Plaintiff's Motion.)  As a circuit court judge, Judge Bernstein earns an annual salary of $140,352.  *See* Md. Code Ann., Cts. & Jud. Proc. § 1-708

(judicial salaries to be determined by Judicial Compensation Commission); http://www.msa.md.gov/msa/mdmanual/26excom/html/22jcomp.html (last visited November 20, 2009) (listing judicial salaries); *see also* Md. Code Ann., Cts. & Jud. Proc. § 1-703(b) (judges receive automatic salary increases equivalent to the increase awarded to State employees in the lowest step of the highest salary grade in the Standard Pay Plan).

Judge Bernstein became vested as a member of the Judge's Retirement System immediately upon his appointment in 2006. Under this pension plan, he will be eligible on December 29, 2009 to begin drawing a pension worth approximately $19,000 per year, a figure that will increase in proportion to any future increases in the salary of sitting circuit court judges. *See* Md. Code Ann., State Pers. & Pens. §§ 27-101 – 27-407. (This is in addition to any retirement benefits he earned in his years of service as an Assistant State's Attorney, as a federal employee, and as a lawyer in private practice.)

Upon his retirement, Judge Bernstein will also be eligible to be recalled to temporary judicial service and to earn compensation for that service. *See* Md. Const. art. IV, § 3A. He will not, however, be eligible to earn creditable time toward his pension benefits. *See* Md. Code Ann., State Pers. & Pens. §§ 27-201(b); *see also Cohen v. Goldstein,* 58 Md. App. 699, 715 (1984) ("The judicial pension system was created for judges. The benefits are generous, to be sure; but it is all subject to the one clear undisputed limitation that a judge may not acquire creditable service after age seventy.").

In  March  of  this  year,  in  a  letter  to  Governor  O'Malley,  Judge  Bernstein acknowledged his impending retirement as an active judge and expressed his hope that he would be recalled to temporary service.  (Exhibit 2.)  Recently, however, Judge Bernstein changed his mind, and, on October 30, he wrote another letter, advising the Governor that he would be "taking appropriate legal action" to challenge the requirement that he cease active service on December 29.   (Exhibit 3.)  Four days later, on November 3, Judge Bernstein filed this suit for declaratory and injunctive relief against the State of Maryland, Governor O'Malley, and the Maryland General Assembly.  (Paper No. 1.)

Judge Bernstein contends that the age restriction set forth in Article IV § 3 applies to him, but not to "[o]ther, older judges, who are elected[] or, arguably, appointed, after turning 70," because those judges "will not 'attain[] the age of seventy' *while in office*."  (*Id.* ¶ 3 (emphasis added).)   Judge Bernstein argues that this "creates an age-based distinction between different classes of judges" that is not supported by a rational basis and that therefore violates his rights under the Equal Protection Clause of the Fourteenth Amendment. (*Id.* ¶ 4.)  He also contends that the Maryland Constitution creates an irrational age-based distinction by allowing the Chief Judge of the Court of Appeals to recall retired judges who "have attained the age of seventy" to temporary service.  (*Id.* ¶ 30.)  He asks this Court to enjoin "each defendant and their [sic] respective agents from enforcing" the Maryland Constitution "to effect his removal from judicial office" and "from preventing his

9

participation in Maryland's judicial benefit plans" at any time before November 4, 2023. (*Id.* ¶ 5, *ad damnum* clauses.)

Judge Bernstein has also filed a motion for a preliminary injunction under Rule 65(a), in which he seeks the same injunctive relief sought in his complaint, pending a full adjudication of the merits of his claims. (Paper No. 2.)

## ARGUMENT

Judge Bernstein's complaint should be dismissed because it does not state a claim on which relief can be granted. Necessarily then, he cannot demonstrate a likelihood of success on the merits of his claim, nor can he satisfy the other factors that would entitle him to preliminary injunctive relief; his motion for a preliminary injunction should therefore be denied.

## I.   THE COMPLAINT SHOULD BE DISMISSED.

It should not be necessary even to consider Judge Bernstein's motion for preliminary injunctive relief because his claims are devoid of merit and are subject to dismissal on multiple grounds.

### A.   This Court Lacks Jurisdiction to Decide an Insubstantial Federal Question Where the Claim is Foreclosed by Supreme Court Precedent.

Judge Bernstein's complaint is subject to dismissal under Rule 12(b)(1), because "general subject-matter jurisdiction is lacking when the claim of unconstitutionality is

insubstantial," *McLucas v. DeChamplain,* 421 U.S. 21, 28 (1975); that is, a federal court lacks power to entertain claims otherwise within their jurisdiction where the complaint's "constitutional allegations are wholly insubstantial or without merit, or foreclosed by prior cases which have settled the question," *Eastern Band of Cherokee Indians v. Donovan,* 739 F.2d 153, 159 (4th Cir. 1984) (citing *Hagans v. Lavine,* 415 U.S. 528, 536-37 (1974)).  A claim is wholly insubstantial if "its unsoundness so clearly results from the previous decisions of [the Supreme Court] as to foreclose the subject and leave no room for the inference that questions sought to be raised can be the subject of controversy." *Hagans,* 415 U.S. at 538.  Here, Judge Bernstein's equal protection claim is squarely foreclosed by the Supreme Court's decision in *Gregory v. Ashcroft,* 501 U.S. 452 (1991), which rejected an equal protection challenge to a Missouri constitutional provision imposing a mandatory retirement age (for some judges, but not others) that is materially indistinguishable from the age restriction imposed in Article IV, § 3 of Maryland's Constitution.

Article 5, § 26 of the Missouri Constitution requires judges to "retire at the age of seventy years," but permits the retired judge to be specially assigned after that age.  The United States Supreme Court upheld the age restriction, articulating a number of rational bases that support a mandatory retirement "*at* the age of seventy years," even though this language conceivably could allow a judge to escape mandatory retirement if he or she first became a judge *after* the age of seventy years.  Judge Bernstein acknowledges the Supreme Court's controlling decision in *Gregory,* but tries to escape its implications by characterizing

the "statute" at issue as "prevent[ing] *all* judges over the age of 70 from serving." (Plaintiff's Memorandum at 5.)   But the language of the Missouri Constitution is no less susceptible to the strained reading Judge Bernstein applies to the Maryland Constitution in concluding that "other, older judges" can avoid mandatory retirement by seeking election or appointment after attaining that age.   The distinction Judge Bernstein attempts to draw between this case and *Gregory* is illusory.   The unsoundness of Judge Bernstein's claim is demonstrated by his failure to meaningfully distinguish it from the claim rejected by the Supreme Court in *Gregory,* which  forecloses the subject and renders Judge Bernstein's claim so insubstantial as to justify dismissal under Rule 12(b)(1).

**B.     The Claims Against the State of Maryland and the Maryland General Assembly Are Barred by Sovereign Immunity.**

Judge Bernstein's complaint suffers from a second jurisdictional defect.   Although he acknowledges in his complaint that the State of Maryland "is a sovereign state with its capital located in Annapolis," (Paper No. 1 ¶ 10), he fails to consider an essential attribute of the State's sovereignty – namely, its immunity from suit in federal court under the Eleventh Amendment.   The State is not susceptible to suit in federal court without a valid waiver or abrogation of its sovereign immunity, and neither exists here.   *See Board of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 363 (2001).   The Maryland General Assembly exercises a portion of the State's sovereign authority (the entire legislative portion, *see* Md. Const. art. III), and is therefore an "arm of the State" that also is entitled to the immunity conferred by

the Eleventh Amendment, *Puerto Rico Aqueduct & Sewer Auth'y v. Metcalf & Eddy, Inc.,*

506 U.S. 139, 144 (1993).  The claims against the State and the General Assembly are barred

by the Eleventh Amendment and should therefore be dismissed.  These claims also are

subject to dismissal on the additional and related ground that neither the State nor the General

Assembly is a "person" subject to suit under 42 U.S.C. § 1983.  *See Will v. Michigan Dep't*

*of State Police,* 491 U.S. 58, 70-71 (1989).

**C.      The Complaint Fails to State a Claim on Which Relief Can Be
         Granted.**

Judge Bernstein claims that the Maryland Constitution's age restrictions for judges

deny him equal protection of the laws because, he contends, they create an age-based

distinction and because, he further contends, this distinction is not supported by a rational

basis.  Neither contention is corrrect, and his federal constitutional claim therefore is without

merit.

**1.      Judge Bernstein's Equal Protection Claim is Based on a
         Flawed Interpretation of Article IV, § 3.**

Judge Bernstein posits two classes of judicial aspirants – "(a) judges aged 55 to 69

years old upon being elected to a 15-year term; and (b) judges over 70 years old upon being

elected or appointed" – and he claims that the two classes "are treated differently" under

Article IV, § 3.  (Paper No. 1 ¶ 26.)  Judge Bernstein has not identified any member of this

hypothesized second class.  And the defendants are not aware of any judge who has been

elected or appointed – or, for that matter, who has even sought election or appointment –

after the age of 70. *Ever.* Indeed, a preliminary review of records of the State archives dating back to 1931, when the age restriction of Article IV, § 3 was proposed in its current form, has disclosed only three judges of the Circuit Court for Baltimore City (formerly the Supreme Bench of Baltimore City) and two judges of the Court of Appeals who served past the age of 70. None of them were elected or appointed after having attained that age; rather, each was continued in office by a resolution of the General Assembly, in the manner prescribed by Article IV, § 3, before its amendment in 1932. *See* 1931 Joint Res. 2 (J. Adkins); 1931 Joint Res. 3 (J. Owens); 1929 Joint Res. 2 (J. Pattison); 1927 Joint Res. 2 (J. Stump); 1927 Joint Res. 4 (J. Dawkins). Thus, it appears that the class of judicial aspirants who benefit from the discriminatory age-based distinction that Judge Bernstein perceives in the Maryland Constitution is, historically, a null set.

If there have never been any members of the favored class posited by Judge Bernstein, it is likely because no one has previously supposed that the Maryland Constitution creates the age-based distinction that Judge Bernstein claims. And for good reason. The claimed distinction finds no support in the plain language of Article IV, § 3. Both Judge Bernstein's favored class and his disfavored class are composed of people who both "have attained the age of seventy." Thus, it is unclear why he thinks members of the ostensible favored class ("other, older judges who are elected[] or, arguably, appointed, after turning 70 " (Paper No. 1 ¶ 3)) are not covered by the age restriction. Under Judge Bernstein's theory, he could be replaced by a 71-year-old, who would then stand for election in 2012, and if elected,

would then serve until at least 2027 (when this hypothetical successor would be 88 years old). But Article IV, § 3 provides for the term of a judge to expire 15 years after the election *or* when the judge "shall have attained the age of seventy years, *whichever may first happen*." Judge Bernstein's theory ignores what "happens first": a person attains the age of 70 years before attaining the age of 88 and before attaining the age of 71.[2] Thus, Judge Bernstein's hypothetical successor would not be able to serve as a judge, because his or her term would have ended before it even began.

Judge Bernstein's eccentric reading of Article IV, § 3 also loses sight of the commonly understood meaning of the word "attain." A person can attain stature, for instance; from that point forward, the person *has* stature. True, stature can be diminished or lost, but *age* cannot. Judge Bernstein has attained the age of 69, and the age of 68, and the age of 67; and so has his hypothetical 71-year-old successor. Members of the United States House of Representatives all have already attained the age of 25, because "[n]o person shall be a Representative who shall not have attained to the Age of twenty five Years." U.S. Const. art I, § 2; *see also* U.S. Const. art. I, § 3 (Senators have "attained to the Age of thirty Years"); U.S. Const. art. II, § 1 (President has "attained to the Age of thirty five Years").

The ineligibility for judicial office of the hypothetical 71-year-old successor to Judge Bernstein is further demonstrated by the cognate provision in Article IV, § 5, which prevents

---

[2] *See* Md. Ann. Code art. I, § 37 ("[A]n individual attains a specified age on the day of the anniversary of the individual's birth.").

the Governor from appointing someone as a judge if that person will turn 70 before the person stands for election (from one to three years hence).  The hypothetical 71-year-old successor to Judge Bernstein could not become a judge by gubernatorial appointment, because he or she "will become disqualified by reason of age and thereby unable to continue to hold office until the prescribed time" for an election.  Md. Const. art. IV, § 5.  This is presumably why Judge Bernstein says that septuagenarians who receive their judicial office by appointment are only "arguably" within the favored class.  (*E.g.,* Paper No. 1 ¶¶ 3, 26; Paper No. 2, at 2.)  It is unclear why he thinks septuagenarians who become judges by winning an election instead of through the more customary appointment process are any different.

Judge Bernstein tacitly acknowledges the strain he puts on the plain language of Article IV, § 3 when he actually quotes the text.  He repeatedly adds the words "while in office" to a provision that does not contain those words.  (*E.g.,* Paper No. 1 ¶ 3 ("Art. IV, § 3 forces competent, duly elected judges . . . out of office . . . because those judges 'attain[] the age of seventy' *while in office*."  (emphasis added); *id.* ¶ 26 (judges in the ostensible favored class "will not be automatically retired, because they will never 'attain[] the age of seventy' *while on the bench*."  (emphasis added); Paper No. 2, at 2 ("[T]he Retirement Clause retires only those appointed judges who 'attain[] the age of seventy' *while in office*."  (emphasis added); *id*. at 6.)  Article IV, § 3 does not limit application of the age restriction to those who turn 70 "while in office," and a Maryland court would be constrained to reject an

interpretation of a constitutional provision that required the insertion of words that are not present in the text. *See Bost v. State,* 406 Md. 341, 350 (2008) ("We neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature used. . . ."); *Wheeler v. State,* 281 Md. 593, 598 (1977) ("We are not at liberty to bring about a different result by inserting or omitting words."); *see also Luppino v. Gray,* 336 Md. 194, 204 (1994) ("The rules governing the construction of statutes and constitutional provisions are the same.").

Significantly, Article IV, § 3 at one time contained the missing words that Judge Bernstein would have this Court supply, and their placement in that version of the provision does not aid his cause. From 1867 until 1932, the phrase immediately following the age-70 restriction stated:

> but in case of any judge who shall attain the age of seventy years *whilst in office*, such judge may be continued in office by the General Assembly for such further time as they may think fit, not to exceed the term for which he was elected, by a resolution to be passed at the session next preceding his attaining said age.

The "whilst in office" limitation did not appear in the clause where Judge Bernstein seeks to have it implied, but in the phrase that sets up a contrast to, and an exception to, that clause. The hypothetical judge who had turned 70 before becoming a judge would not have been eligible for this exception, but a judge – like Judge Bernstein (before the conclusion of the 2009 legislation session) – who would turn 70 while in office would have been eligible. He is not eligible today. The legislature and the voters determined to discontinue this exception,

and now *no* judge is eligible for active service after turning 70.[3]  *See* 1931 Laws of Md., ch. 479 (ratified Nov. 8, 1932); *see also* 1953 Laws of Md., ch. 607 (ratified Nov. 2, 1953) (removing grandfather clause protecting judges whose terms had previously been extended by legislative action).

While Judge Bernstein would like to add some words to the Constitution ("while in office") and remove others ("whichever may first happen"), the provision as a whole – as drafted by the General Assembly and ratified by the voters – conveys the unmistakable message that no exceptions to the age-70 restriction were intended.   One exception (permitting extension of terms by legislative authorization) was removed in 1931, and another exception (permitting extension of term to age 75 upon Court of Appeals certification of fitness) was rejected in 1994.   The age-70 restriction was important enough for it to be repeated a second time ("and be reeligible thereto until he shall have attained the age of seventy years") and to be followed by the emphatic phrase, "*and not after.*"

---

[3]  Contemporary news articles suggest that the exception was discontinued in part because legislators resented being pressured by sitting judges who were resisting retirement. *See* "Pressure Hinted in Favoring Judges," *Baltimore Sun,* Jan. 22, 1931, at 7; "State Senate Gets Amend[] [illegible],"*Baltimore Sun,* Feb. 4, 1931, at 4; "Fight over Judge Terms Due Today," *Baltimore Sun,* Feb. 5, 1931, at 4; "Terms of Judges Face Senate Fight," *Baltimore Sun,* Feb. 6, 1931, at 4;"Senate Approves Resolutions Extending Terms of Judges," *Baltimore Sun,* Feb. 12, 1931, at 24; "Coad Wins Fight on Judges' Terms," *Baltimore Sun,* March 6, 1931, at 4; "Term Extension Bill is Advanced," *Baltimore Sun,* March 18, 1931, at 4; "Extending Terms of Judges Banned," *Baltimore Sun,* April 1, 1931, at 7; *see also* "Reflection Bill Given to Senate," *Baltimore Sun,* Feb. 8, 1929, at 6; "Ban on Extending Terms of Judges is Favored," *Baltimore Sun,* March 2, 1929, at 10;"House Votes Bill Hitting Informers," *Baltimore Sun,* March 6, 1929, at 7; "Through Traffic Bill Passes House," *Baltimore Sun,* March 26, 1929, at 6.  (Copies of the articles are attached as Exhibit 4.)

A Maryland court construing a constitutional provision is required to eschew the fine grammatical parsing of isolated phrases that Judge Bernstein's proposed interpretation requires. Instead, a court must "bear in mind that it is dealing with an instrument of government," and, therefore, "literalism and verbalism must yield to the essential and underlying claims of the people of the State to have a reasonable and effective government." *Montgomery County Comm'rs v. Supervisors of Elections,* 192 Md. 196, 208 (1948). "[C]onstitutions are not to be interpreted according to the words used in particular clauses. The whole must be considered, with a view to ascertain the sense in which the words were employed, and its words must be taken in their ordinary and common acceptation, because they are presumed to have been so understood by the framers and by the people who adopted it. . . . [The Constitution], unlike the Acts of our legislature, owes its whole force and authority to its ratification by the people, and they judged of it by the meaning apparent on its face. . . ." *Andrews v. Governor of Maryland,* 294 Md. 285, 290 (1982). The language of Article IV, § 3, when read in the manner prescribed by Maryland law, does not support Judge Bernstein's newly discovered interpretation, which assumes the existence of a putative favored class that is populated only by hypothetical judges who have never served or attempted to serve as judges and who would be ineligible to do so under the common understanding of the age restriction since it was ratified by the citizens of Maryland more than three-quarters of a century ago.

19

**2.** **Even Under Judge Bernstein's Erroneous Reading of Article IV, § 3, He Has Failed To Show That He is the Victim of Unequal Treatment.**

For the reasons discussed above, this Court should reject Judge Bernstein's assertion that the Maryland Constitution prohibits active service as judges by certain 70-year-olds, but not others. There are no others in his imagined class of judges who escape the effect of the constitutional age restriction, and there never have been. If, however, he is right that the Maryland Constitution does create such a class, he is eligible to become its very first member. Under his theory, a judge can avoid the age restriction if he or she is not holding office on his or her 70th birthday. After a person has attained that age, a "judge or attorney" could be "elected, or, arguably, appointed to judicial office . . . [and] be safe from the Retirement Clause." (Paper No. 2, at 2.) If this is right, Judge Bernstein could, without this Court's intervention, make himself safe from the Retirement Clause by the simple expedient of retiring on December 28, 1999, the day before he turns 70. At that point, he could seek a judicial appointment – even to the vacancy he himself created – or run for judicial election, just as other (also hypothetical) members of this supposed favored class could.

An essential element of any equal protection claim is, of course, unequal treatment. "To succeed on an equal protection claim, a plaintiff must . . . demonstrate that he has been treated differently from others with whom he is similarly situated. . . ." *Morrison v. Garraghty,* 239 F.3d 648, 654 (4th Cir. 2001). Judge Bernstein contends that he is a member of a disfavored class because he will turn 70 while in office and have to cease active service.

But he is not being treated differently from others who are similarly situated:  all sitting judges who were 55 or older when elected are in the same boat.  If, on the other hand, Judge Bernstein gives up his status as a sitting judge, he becomes similarly situated to every other 69-year-old who meets the judicial qualifications set forth in Article IV, § 1, and, under his theory, he will not be treated differently from them: they all will be eligible to seek appointment or election as a judge.  Thus, at this most fundamental level, Judge Bernstein is unable to show that he is the victim of unequal treatment, and his equal protection claim must be rejected.

### 3.    The Constitutional Age Restriction for Judges is Supported by a Rational Basis.

As Judge Bernstein acknowledges (Paper No. 2, at 4), an age-based distinction is invalid only if it is not rationally related to a legitimate state interest.  *See Gregory v. Ashcroft,* 501 U.S. 452, 470 (1991) ("The State need . . . assert only a rational basis for its age classification.").  As Judge Bernstein further acknowledges, an age-70 mandatory retirement provision for state-court judges, like the one at issue here, was upheld by the Supreme Court under this rational-basis standard in *Gregory v. Ashcroft*.  *See id.* at 473.  And, while he attempts to distinguish *Gregory* by pointing to a different variation on the same age-based distinction, the rational bases that the Supreme Court identified in *Gregory* support a state's adoption of a uniform age restriction for judges (which is what the Maryland Constitution contains) and equally support a non-uniform age restriction for judges (which

is what Judge Bernstein imagines the Maryland Constitution contains).  In *Gregory,* the Supreme Court explained that the judicial role is difficult and that "[i]t is an unfortunate fact of life that physical and mental capacity sometimes diminish with age."  *Id.* at 472.  Other methods of replacing judges – voluntary retirement, impeachment, and contested election – may be insufficient.  *See id.*  "Mandatory retirement is a reasonable response."  *See id.*

Age restrictions for state-court judges are commonplace,[4] and many, including the Missouri constitutional provision examined in *Gregory*, embody age classifications that apply to some types of judges and not others.  Indeed, as explained above, the Missouri provision is susceptible to the same imaginative re-interpretation that Judge Bernstein has attempted here, in order to find a non-uniform age-based distinction that turns on whether one is a sitting judge at the time of one's 70th birthday.  Nevertheless, courts have upheld these provisions against equal protection claims, both before and after the Supreme Court's decision in *Gregory*, because they have had no difficulty identifying the multiple rational bases that can support various age-based distinctions for judicial eligibility.[5]  These include

---

[4] *See, e.g.,* Alaska Const. Art. IV, § 11 (West 1996); Ariz. Const. Art. VI, § 39; Colo. Const. art. VI, § 23; Conn. Const. Art. V, § 6; Fla. Const. art. V, § 8; Iowa Code Ann. § 602.1610; Kan. Stat. Ann. § 20-2608; La. Const. art. V, § 23(B); Mass. Const. art. I, pt. 2, ch. 3, art. 1; Minn. Stat. Ann. § 490.125; Mo. Const. art. V, § 26; N.H. Const. pt. 2, art. 78; N.Y. Const. art. VI, § 25; Ohio Const. art. IV, § 6; Or. Const. art. VII, § 1a; 42 Pa. Cons. Stat. § 3351; S.D. Codified Laws § 16-6-31; Tex. Const. art. V, § 1-a; Utah Code Ann. § 49-17-701; Vt. Const. ch. II, § 35.

[5] Judge Bernstein bases his entire equal protection analysis on "[t]wo prominent cases": *Gregory* and *Maddux v. Blagojevich,* 911 N.E.2d 979 (Ill. 2009).  The first, a decision by the United States Supreme Court, creates binding precedent on this Court; the second, a decision by the Illinois Supreme Court, does not.  Moreover, *Maddux* is distinguishable both

(1) creating openings for younger judges, *see Breck v. Michigan,* 203 F.3d 392, 396 (6th Cir. 2000); (2) easing docket congestion by creating a pool of retired judges, *see id.*; *Keefe v. Eyrich,* 489 N.E. 2d 259, 261 (Ohio 1986); and (3) reducing the risk of age-related incompetence, *see Breck,* 203 F.3d at 396; *Keefe,* 489 N.E. 2d at 261; *O'Neil v. Baine,* 568 S.W.2d 761, 766-67 (Mo.1978) (*en banc*) (same); *EEOC v. Massachusetts,* 858 F.2d 52, 57-58 (1st Cir. 1988) (mandatory retirement avoids the "perilous task of evaluating the performance of . . . older judges"; "[t]he forced turnover may permit the appointment of judges that more closely reflect prevalent points of view, as well as the present societal makeup"); *Malmed v. Thornburgh,* 621 F.2d 565, 572 (3d Cir. 1980) (a mandatory retirement provision "eliminates the unpleasantness of selectively removing aged . . . judges"); *Trafelet v. Thompson,* 594 F.2d 623, 627, 629 (7th Cir. 1979) (it is rational to treat "judges differently from other officials on the ground that the work of judges makes unique and exacting demands on faculties that age tends to erode"; "[m]andatory retirement . . . reduces delays in the administration of justice caused by death or disabling illness of sitting judges," the risk of which increases as a judge's age increases); *Apkin v. Treasurer & Receiver Gen.,* 517 N.E.2d 141, 146 (Mass. 1988) ("A line drawn at age seventy eliminates the anguish, time, delay, expense, and embarrassment of the supervision and removal of older judges of failing

---

factually and legally.  In that case, the court sought to reconcile (using Illinois canons of interpretation) what it believed were incompatible state constitutional and statutory provisions, and to apply these provisions to "contested elections" and "retention elections" in a judicial selection system with features unlike Maryland's.

competence pursuant to an evaluation process.  An age limit on the service of judges also tends to assure that important decisions . . . will be made by judges who command respect because they share experiences and understandings similar to those of the majority of adult citizens. . . . [Furthermore, it] makes it possible to increase the proportion of minority group members and women in the judiciary, thereby making the judiciary more representative of society").  One might disagree with some or all of these rationales, on either empirical or philosophical grounds, and yet be unable to conclude that a State that has concluded otherwise lacks a rational basis for its age restrictions for judges.

Moreover, even if Judge Bernstein's theory were true – that there could be a cohort of people that may serve as Maryland judges past the age of 70 while he may not – that would not render the classification unconstitutional.  Neither perfection nor mathematical nicety are required to satisfy rational-basis scrutiny under the Equal Protection Clause.  *See Gregory,* 502 U.S. at 473 (citing *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313-14 (1976)); *Vance v. Bradley,* 440 U.S. 93, 108 (1979); *see also Breck,* 203 F.3d at 397 ("[T]he Supreme Court has recognized and accepted that some classifications have unnecessary and harsh results.").  Under a rational basis standard, an age-based classification is not infirm merely because it may be underinclusive or overinclusive, and a law does not offend equal protection just because the legislature could have proceeded farther than it did: A legislature "need not strike at all evils at the same time," and "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the

24

legislative mind." *City of New Orleans v. Dukes,* 427 U.S. 297, 305 (1976). These principles apply with even greater force when the law at issue is not a mere legislative act, but a constitutional provision ratified by the voters. Thus, even if the Maryland constitutional age restriction could be construed to permit some small class of judicial aspirants to become judges and "be safe from the Retirement Clause" (Paper No. 2, at 2), this supposed underinclusiveness would not create an equal protection violation.

### D.   This Court Should Not Construe State Law to Create a False Conflict with Federal Law.

Judge Bernstein's federal claim is based on a misapprehension of State law, but even if this Court determines that a Maryland court could conceivably accept Judge Bernstein's distorted reading of Article IV, § 3, he would still fail to establish a violation of federal law, as explained above. This Court should therefore dismiss the complaint for failure to state a claim on which relief can be granted. If, however, the Court concludes that it is necessary to resolve the unsettled question of State law on which Judge Bernstein's federal constitutional claim depends, the Court should stay its adjudication of the claim, and permit this predicate question of State law to be resolved in state court, in accordance with the *Pullman* abstention doctrine. *See Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496 (1941).

This Court should not construe Maryland law in a way that would create a conflict with federal law, because "[a] federal district court 'lack[s] jurisdiction authoritatively to

construe state legislation.'" *Virginia Soc'y for Human Life, Inc. v. Caldwell,* 152 F.3d 268,

270 (4th Cir. 1998) (quoting *United States v. Thirty-Seven (37) Photographs,* 402 U.S. 363,

369 (1971)).  Where a decision is to be made on the basis of state law, the Supreme Court

has shown a strong preference for the controlling interpretation of the relevant state law to

be given by state, rather than federal, courts. *See, e.g., Arizonans for Official English v.

Arizona,* 520 U.S. 43, 76 (1997) (noting the advantage of "plac[ing] state-law questions in

[state] courts [which are] equipped to rule authoritatively on them"); *Lehman Bros. v. Schein,*

416 U.S. 386, 391 (1974).

The *Pullman* abstention doctrine provides a means for resolving the quandary created

by Judge Bernstein's decision to bring this suit in federal court.  Under that doctrine, a

federal court may, and ordinarily should, refrain from deciding a case in which state action

is challenged as contrary to the federal constitution if there are unsettled questions of state

law that may be dispositive of the case and avoid the need for deciding the constitutional

question.  *See Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 236 (1984); *Meredith v.

Talbot County,* 828 F.2d 228, 231 (4th Cir. 1987).  No Maryland court has considered, much

less endorsed, the interpretation of Article IV, § 3 that Judge Bernstein urges here.  His

federal claim depends entirely on whether this interpretation is correct; accordingly, the

answer to this State-law question could "avoid or substantially modify the federal

constitutional challenge" he has advanced.  *Bellotti v. Baird,* 428 U.S. 132, 147 (1976).

Indeed, *Pullman* abstention is warranted here because, "in the absence of an authoritative

construction" of the Maryland constitutional provision at issue, "it is impossible to define precisely the constitutional question presented." *Id.* at 148.

The Court may also wish to consider using the procedure of certifying to the Maryland Court of Appeals the underlying State-law question concerning the proper interpretation of Article IV, § 3. *See* Md. Code Ann., Cts. & Jud. Proc. §§ 12-601 — 12-613. This procedure advances the same objectives furthered by *Pullman* abstention: "avoiding advisory constitutional decisionmaking [and] promoting the principles of comity and federalism." *Pustell v. Lynn Pub. Schs.,* 18 F.3d 50, 53 (1st Cir. 1994). In a case like this one, where the adjudication is not likely to require the resolution of factual disputes, the certification procedure tends to reduce delay and expense, while "increasing the assurance of obtaining an authoritative response"resolving the State-law question. *Arizonans,* 520 U.S. at 76; *see also Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 465 (1967) ("[T]he State's highest court is the best authority on its own law.").

Neither abstention nor certification is necessary, however, if this Court determines that Maryland courts would not adopt the interpretation of the Maryland Constitution urged by Judge Bernstein or if the Court determines that, even under that interpretation, he has failed to establish that the State Constitution violates his equal protection rights. Either determination would lead to a more expeditious resolution of this litigation than abstention or certification, and, for the reasons discussed above, both of these determinations are correct. The complaint should therefore be dismissed.

27

## II.   JUDGE BERNSTEIN IS NOT ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF.

### A.   Judge Bernstein Bears the Burden of Satisfying Each of the Four Requirements for a Preliminary Injunction.

The Supreme Court in *Winter v. Natural Resources Defense Council, Inc*., 129 S. Ct. 365, 376, 374, 375-77 (2008), established the requirements for obtaining a preliminary injunction in federal court.  A party seeking preliminary injunctive relief "must demonstrate by 'a clear showing'" that it satisfies each of the following four requirements:  (1) "that it will likely succeed on the merits at trial"; (2) "that it is likely to be irreparably harmed absent preliminary relief"; (3) "that the balance of equities tips in [its] favor"; and (4) "that an injunction is in the public interest." *Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 345-47 (4th Cir. 2009) (quoting *Winter*, 129 S. Ct. at 376, 374, 375-77 (2008)).

Before a preliminary injunction may issue, all four of these requirements "must be satisfied as articulated" in *Winters*.  *Real Truth*, 575 F.3d at 347.  As the Fourth Circuit explained, *id*., *Winter* effectively abrogates the Fourth Circuit's prior standard for preliminary injunctive relief as set forth in *Blackwelder v. Furniture Co. of Statesville v. Seilig Manufacturing Co*., 550 F.2d 189, 196 (4th Cir. 1977).  In particular, *Winter* precludes the "'flexible interplay' among all the factors considered," *Blackwelder*, 550 F.2d at 196, which formerly allowed the requirements for a preliminary injunction "to be conditionally redefined as other requirements [were] more fully satisfied," *Real Truth*, 575 F.3d at 347.  Unlike *Blackwelder* and its progeny, which permitted a plaintiff to obtain an injunction by making a strong showing as to one or more factors but a relatively weak showing as to other factors,

*Winter* now requires each of its four requirements to be proven independently.  *See Real Truth*, 575 F.3d at 347.

As to the first requirement, the plaintiff "bears a heavy burden in showing its likelihood of success," and "[a]ny relaxation of its burden, for example to require that [plaintiff] show only a *possibility* that it will eventually prevail, would be inadequate." *Real Truth*, 575 F.3d at 349 (emphasis in original) (citing *Winter*, 129 S. Ct. at 375-76).  Under *Winter*, the "likelihood of success" requirement is "far stricter" than the *Blackwelder* standard, which formerly permitted a plaintiff to obtain preliminary relief upon demonstrating "only a grave or serious *question* for litigation." *Real Truth*, 575 F.3d at 347 (emphasis in original).  Similarly, under *Winter* the moving party must make a "clear showing" that it will suffer harm that is irreparable; it is no longer sufficient, as it might have been under *Blackwelder*, for a plaintiff to point to a "possibility" of harm or merely show that the plaintiff's injury will outweigh the defendant's.  *Real Truth*, 575 F.3d at 347.

Whereas the public interest requirement sometimes received little more than *pro forma* consideration under *Blackwelder*, *see Real Truth*, 575 F.3d at 347, *Winter* emphasizes the public interest and insists that a court of equity should "'pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Winter*, 129 S. Ct. at 376-77 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  As further explained in *Romero-Barcelo*, if the requested preliminary injunction "'will adversely affect a public interest . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." 456 U.S. at 312 (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)).

### B.    Judge Bernstein Has Not Made a Clear Showing That He Is Likely to Succeed on the Merits.

Far from making the clear showing of a likelihood of success on the merits, as *Winter* and *Real Truth* require, Judge Bernstein has failed even to state a claim on which relief can be granted, as explained above.  Because he must satisfy all four of the *Winter* factors, his failure to state a meritorious claim requires his motion for a preliminary injunction to be denied on this basis alone.

### C.    Judge Bernstein Has Not Made a Clear Showing That He Is Likely to Be Irreparably Harmed Absent an Injunction.

Judge Bernstein fails to satisfy his burden of making a "clear showing" that he is likely to suffer irreparable harm in the absence of preliminary relief, *Real Truth*, 575 F.3d at 346, because the purported harms he identifies are not irreparable.

First, under the controlling authority of the Supreme Court's decision in *Winter* as explained by the Fourth Circuit in *Real Truth*, there is no merit whatsoever to Judge Bernstein's contention that his mere assertion of a constitutional claim – which is itself insubstantial – can suffice to establish "*per se* irreparable harm." (Paper No. 2, at 7.) In *Real Truth*, which involved claims under the First and Fifth Amendments, the Fourth Circuit made clear that the requisite "clear showing" of irreparable harm is "[i]n addition to," and not to be "intertwined" with, the required showing of a likelihood of success on the merits of the plaintiffs' claims.  575 F.3d at 351, 347; *see also id.* at 351 (questioning the district court's analysis of "irreparable harm" because it was "in effect, an extension of" the analysis of the

constitutional claims).  In the course of articulating the requirements for a preliminary injunction, *Winter* expressly rejected the "possibility of irreparable harm" standard applied in a Ninth Circuit decision, *Faith Center Church Evangelistic Ministries v. Glover*, 480 F.3d 891 (9th Cir. 2007), which had held that "the existence of a colorable First Amendment claim" was itself "sufficient to demonstrate irreparable injury" for purposes of preliminary relief.  *See Winter*, 129 S. Ct. at 375-76 (rejecting as "too lenient" the "incorrect standard" stated in *Faith Center Church*, 480 F.3d at 906).  Judge Bernstein's effort to equate his constitutional claim with irreparable harm is further contradicted by the Supreme Court's insistence in *Winter* that, even after a claim has been ultimately established at a trial, the issuance of an injunction "does not follow from success on the merits as a matter of course"; instead, the other factors articulated in *Winter*, including irreparable harm, are independently "pertinent in assessing the propriety of any injunctive relief, preliminary or permanent. . . ." *Winter*, 129 S. Ct. at 381.

Moreover, if the same "*per se* irreparable harm" argument were to be made in a case pending before Judge Bernstein in State court rather than in a case brought by him in this Court, he would be constrained to reject it.  According to well-established Maryland common law, a court of equity will not "restrain acts, actual or threatened, merely because they are illegal or transcend constitutional powers, unless it is apparent that irremediable injury will result." *El Bey v. Moorish Science Temple of America, Inc.*, 362 Md. 339, 354 (2001).  "The mere assertion that apprehended acts will inflict irreparable injury is not enough.  The

complaining party must allege and prove facts from which the court can reasonably infer that such would be the result."  *Id.*

In addition to his ill-considered *per se* argument, Judge Bernstein claims erroneously that he "will suffer real and irreparable practical harms" in the form of "irreparable pecuniary harm" and the likelihood that he will be "precluded from reinstatement to his job as a Judge of the Circuit Court for Baltimore City."  (Paper No. 2 at 8-9.)  He also worries needlessly – and mistakenly, as a matter of law – that if the vacancy is filled upon his retirement, "reinstatement will quickly become a literal impossibility."  *Id.* at 10.  These claims of irreparability are entirely unfounded, because Maryland law offers more than adequate remedies that are available to prevent any of these purported harms from being irreparable.

As the Court of Appeals has explained, "When the title to public office is the principal issue involved and the determination of this question involves a question of law, a mandamus has consistently been held by this Court to be the proper remedy."  *Forami v. Reynolds*, 248 Md. 246, 252 (1967).  If the final adjudication of this case were to uphold Judge Bernstein's constitutional challenge, then mandamus – a remedy available "at law," *see id.* at 253 – would suffice to cure all of his claimed injuries.  "The writ of mandamus may issue *to require the appointment of a public official* when only a legal question is involved, . . . *to reinstate a person in an office* from which he has been illegally removed, . . . and the writ may issue *to compel a person to vacate an office and to cease from the exercise of its*

*functions." Id.* at 253 (emphasis added).[6]  This remedy should also assuage Judge Bernstein's

concern that he will suffer an irreparable loss of income, because the remedy includes the

power to award backpay.  For example, the writ of mandamus affirmed in *Forami* directed

that a public official be reinstated "*with back pay.*"  *Id.* at 247 (emphasis added).  As Judge

Bernstein himself acknowledges (Paper No. 2, at 10), the ability to recover lost income

through the legal remedy of mandamus means that his pecuniary loss would be deemed only

"temporary" and not an "irreparable injury."  *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

If necessary, a court may grant injunctive relief, as an alternative to the writ of mandamus,

to redress whatever injuries might involve considerations beyond the legal questions that

pertain to the disputed title to the office.  *Forami,* 248 Md. at 253.

Thus, there is no validity to Judge Bernstein's claim of irreparable harm.  The

availability of an adequate remedy at law is not contradicted by his choice to forgo

proceedings in the courts of Maryland and thereby deprive Maryland courts of the

---

[6] If a judge is appointed to fill the vacancy created by Judge Bernstein's retirement, Maryland's *de facto* officer doctrine ensures that Judge Bernstein's constitutional challenge will not draw into question the validity of decisions and other official acts taken by the successor judge.  The official acts of *de facto* officers "should be recognized as valid on grounds of public policy, and for the protection of parties in actions and prosecutions, and of those having occasion for the official services or exercise of the functions" of the officer.  *Kimble v. Bender*, 173 Md. 608, 624 (1938).  "All that is required when there is an office, to make an officer *de facto*, is that the individual claiming the office is in possession of it, performing duties and claiming to be such officer under color of an election or appointment, as the case may be."  *Izer v. State*, 77 Md. 110, 115 (1893) (citation omitted).  "It is not necessary that his election or appointment be valid, for that would make him an officer *de jure.*"  *Id.*

opportunity to consider the validity of his novel and heretofore unimagined interpretation of a provision of the Maryland Constitution. *Cf. Martin Marietta Corp. v. Maryland Comm'n on Human Relations* 38 F.3d 1392, 1396 (4th Cir. 1994) (State courts are "fully competent to decide issues of federal constitutional law").   Though Judge Bernstein attempts to use Maryland's sovereign immunity against it to manufacture an argument that "backpay and other monetary damages are likely unavailable here," Memorandum at 9, that argument is unavailing.  As explained above, the appropriate disposition of this action is dismissal, or failing that, abstention or certification; nevertheless, even if this Court were to retain jurisdiction, and even if the Court ultimately were to decide the case in favor of Judge Bernstein, Maryland law would still afford him the opportunity to seek a writ of mandamus in State court to restore him to the judgeship and compensate him for any lost income. *See Forami*, 248 Md. at 253.  Therefore, Judge Bernstein cannot maintain that he lacks an adequate remedy at law.  For that reason, he cannot satisfy his burden of showing that he is likely to suffer irreparable harm absent preliminary relief.

**D.    Judge Bernstein Has Not Made a Clear Showing That the Balance of Equities or the Public Interest Would Favor an Injunction.**

Judge Bernstein cannot meet his burden of showing that the balance of harms favors a preliminary injunction, nor can he show that the public interest would be served by enjoining the longstanding constitutional processes for selecting and qualifying state court judges.  Although he claims that a preliminary injunction would preserve the status quo, this elides significant features of the current state of affairs.  Today, the Maryland Constitution

and its judicial selection mechanism operate free from interference; if this feature of the status quo is preserved, the only thing that will happen is that we will all grow one day older each day, and Judge Bernstein's term will end when he turns 70.  Maintaining the status quo does not mean arresting the passage of time.  Judge Bernstein's suggestion that maintaining him in office is equivalent to maintaining the status quo suffers from the same question-begging problem as his repeated claim that his "natural" term of office will not expire until 2023.  The term to which he was elected in 2008 is one that "naturally" ends when he naturally turns 70.

"In *Winter*, the Supreme Court emphasized the public interest requirement" by instructing lower courts to "'pay *particular regard* for the public consequences in employing the extraordinary remedy of injunction.'"  *Real Truth*, 575 F.3d at 347 (quoting *Winter*, 129 S. Ct. at 376-77).  Judge Bernstein seeks to skirt the public interest inquiry with the same bootstrapping argument he uses in asserting "*per se*" irreparable harm, claiming that "it is beyond peradventure that the State has no legitimate interest in the operation of an unconstitutional law." (Paper No. 2, at 12.)  This vastly overstates the strength of his claim and understates the extraordinary nature of the relief he seeks.  Judge Bernstein, after all, asks this Court to issue a sweeping injunction against any actions "to effect [his] removal from judicial office," including, presumably, the Governor's exercise of his appointment power.  In *Gregory*, the Supreme Court eloquently articulated both the public interest in upholding a State constitutional provision structuring the state judicial system and the

significant harm inflicted by even a temporary imposition on this fundamental attribute of

State sovereignty:

> The present case concerns a state constitutional provision through which the
> people of Missouri establish a qualification for those who sit as their judges.
> This provision goes beyond an area traditionally regulated by the States; it is
> a decision of the most fundamental sort for a sovereign entity. Through the
> structure of its government, and the character of those who exercise
> government authority, a State defines itself as a sovereign. "It is obviously
> essential to the independence of the States, and to their peace and tranquility,
> that their power to prescribe the qualifications of their own officers . . . should
> be exclusive, and free from external interference, except so far as plainly
> provided by the Constitution of the United States." *Taylor v. Beckham*, 178
> U.S. 548, 570-571(1900).  *See also Boyd v. Nebraska ex rel. Thayer*, 143 U.S.
> 135, 161 (1892) ("Each State has the power to prescribe the qualifications of
> its officers and the manner in which they shall be chosen").

501 U.S. at 460.  The Supreme Court's decision in *Gregory* not only disposes of his claim

on the merits, but also refutes his suggestion that the State's interest in its own constitutional

governance is not "a weighty one."  (Paper No. 2, at 12.)

36

## CONCLUSION

Judge Bernstein's motion for a preliminary injunction should be denied, and his complaint should be dismissed.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

/s/

_____

WILLIAM F. BROCKMAN (Bar No. 26576)
DAN FRIEDMAN (Bar No. 24535)
STEVEN M. SULLIVAN (Bar No. 24930)
Assistant Attorneys General
200 St. Paul Place
Baltimore, Maryland 21202
wbrockman@oag.state.md.us
dfriedman@oag.state.md.us
ssullivan@oag.state.md.us
(410) 576-7055 (tel.)
(410) 576-6955 (fax)

Attorneys for Defendants

Dated:  November 20, 2009